# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

ATLANTA FIBERGLASS USA,    :
LLC, a Georgia Limited Liability    :
Company,    :
   :
       Plaintiff,    :     CIVIL ACTION NO.
   :     1:11-CV-04367-RWS
v.    :
   :
KPI, CO., LTD., a Korean    :
Company,    :
   :
       Defendant.    :

## ORDER

This case comes before the Court on Defendant KPI, Co., LTD's ("KPI")

Motion to Dismiss [15]; KPI's Motion for Discovery [17]; Plaintiff Atlanta

Fiberglass USA, LLC's ("AFG") Motion for Leave to File Second Amended

Complaint and to Add Parties, S.K. Hwang and Hyo Kyung Cho [26]; and

KPI's Motion for Leave to File Short Sur-Reply in Opposition to Plaintiff's

Motion for Leave to Amend the Complaint and to Add Parties [35]. After

reviewing the record, the Court enters the following Order.

## Background[1]

---

[1] As the case is before the Court on a Motion to Dismiss, the Court accepts as
true the facts alleged in the complaint. Cooper v. Pate, 378 U.S. 546, 546 (1964).

This case arises out of KPI's alleged breach of an exclusive business agreement with AFG governing the manufacture and sale of fiberglass fabric. Plaintiff AFG is a Georgia Limited Liability Company ("LLC") with its principal place of business in the state of Georgia. (Compl., Dkt. [1] ¶ 1.) Defendant KPI is a Korean company that manufactures fiberglass fabric. (Id. ¶ 6.) Prior to events giving rise to this litigation, the principal of AFG, Mr. Mandanjit Oberoi, had successfully built state of the art fiberglass manufacturing facilities in India, Israel, and Thailand, thereby acquiring a substantial marketing and sales platform. (Id. ¶ 11.)

In 1995, following its unsuccessful attempts to enter the United States commercial market for fiberglass fabric, KPI approached AFG and requested that AFG enter into an exclusive sales and product development arrangement with KPI, the purpose of which was to enable KPI to penetrate the United States market. (Id. ¶¶ 7-10.) Thus, in 1996, KPI and AFG entered into an exclusive business agreement, whereby:

(a) KPI agreed to manufacture all of the products required by AFG for sale in the United States,

(b) KPI agreed to sell exclusively to AFG in the United States,

(c)    AFG agreed to sell KPI goods to both end-users and distributors or resellers known to or developed by AFG, and

(d)    AFG agreed to assist end-users and re-sellers in developing new technologies and specific fiberglass fabric products for exclusive manufacture by KPI.

(Id. ¶ 13.)  In 2004, AFG was formally organized for business tax purposes and the agreement between Mr. Oberoi and KPI was assigned to AFG with the full consent of KPI.[2]  (Id. ¶ 14.)  At all times since the formal organization of AFG, the parties have continued to perform the agreement in the same manner as they have done since 1996.  (Id. ¶ 15.)

At the time the agreement was entered into, KPI manufactured only one type of fiberglass fabric for the United States market.  (Id. ¶ 16.)  At all times during which the parties completely performed the agreement, the parties understood:

(a)    that KPI would retain no intellectual property ownership in the technology and products developed by AFG and its end users,

---

[2] Based on this allegation, it appears that the exclusive business agreement entered into in 1996 was originally between Mr. Oberoi and KPI, rather than AFG and KPI.  (Compare Compl. ¶ 13 (alleging that AFG and KPI entered into exclusive business agreement in 1996) with Compl. ¶ 14 (alleging that AFG formally was organized in 2004 and agreement entered into by Mr. Oberoi and KPI assigned to AFG).)

3

(b)     that KPI would not sell products manufactured utilizing the
        technology and products developed by AFG and its end
        users to any person or entity other than AFG, and

(c)     that KPI was granted only a limited license to use the
        technology to manufacture the materials ordered by AFG for
        its end-users.

(Id. ¶ 16.)  Since 1996, AFG and its customers in the United States jointly have

developed more than forty-six (46) different styles and types of fiberglass

fabric.  (Id. ¶ 17.)  In each instance, the intellectual property and technical

knowledge of the end-user were licensed to KPI, on a limited basis, so KPI

could manufacture the newly developed product for the exclusive use of AFG

and the end-user.  (Id.)  During the fifteen years in which the parties fully

performed their agreement, AFG purchased millions of yards of fiberglass

fabric from KPI and was KPI's only United States customer.  (Id. ¶¶ 19-20, 22.)

        In March 2011, KPI suggested to AFG that the two circumvent AFG's

network of distributors and re-sellers in order to gain the economic benefit of

"cutting out the middle man."  (Id. ¶ 21.)  AFG refused.  (Id.)  On November

18, 2011, knowing that Mr. Oberoi would be unavailable for two weeks due to

his travel schedule, KPI sent AFG an email, informing AFG of its intention to

materially breach the agreement in a number of ways.  (Id. ¶ 23.)  In particular,

4

KPI informed AFG that it would no longer sell any products to AFG, including those that had been developed by AFG and its customers, and that it immediately would inform all of AFG's customers known to KPI that it would no longer sell to AFG but would sell to them directly instead. (Id. ¶ 23.)

Immediately thereafter, KPI began contacting AFG's customers, including but not limited to Alpha Associates, Inc. ("Alpha") of Lakewood, New Jersey, which company had historically purchased millions of dollars of products per year from AFG. (Id. ¶ 24.) KPI informed Alpha that it was no longer selling goods to AFG; that it would now sell directly to Alpha; and that it was no longer selling to AFG because AFG had failed to pay its invoices in a timely manner—which assertion AFG alleges was false. (Id.) KPI also revealed to Alpha and others proprietary pricing information of AFG. (Id.) As a result of KPI's breach of its agreement with AFG, AFG has suffered both monetary and non-monetary damages, including, but not limited to, loss of customer goodwill. (Id. ¶ 25.)

As a result of the foregoing, AFG filed a Complaint in this Court, raising claims for breach of contract (Count I); defamation (Count II); tortious interference with business relations (Count III); tortious interference with

5

contractual relations (Count IV); fraud (Count V); misappropriation of trade secrets (Count VI); and for injunctive relief (Count VII). (See generally Dkt. [1].) AFG also filed an Amended Complaint, which incorporates by reference the claims raised in the original Complaint and raises new claims for violation of the Sherman Antitrust Act, 15 U.S.C. § 1, et seq., and Clayton Act, 15 U.S.C. § 14 (Count VIII) and the Georgia law prohibition against contracts in restraint of trade, codified at O.C.G.A. § 13-8-2 (Count IX). (See generally Dkt. [10].)[3]

KPI now moves to dismiss the Amended Complaint for failure to state a claim upon which relief may be granted, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). (See generally Dkt. [15].) AFG moves for leave of Court to file a Second Amended Complaint to add as party Defendants S.K. Hwang and Hyo Kyung Cho, the owners of KPI, and to add a claim for fraudulent transfer, based on the new allegation that KPI is actively involved in a fraudulent scheme to transfer its assets to other entities and render itself judgment-proof.[4] (See generally Dkt. [26].) The Court considers these

[3] The Court refers to the original Complaint [1] and Amended Complaint [10] collectively as the "Amended Complaint."

[4] Also before the Court are KPI's Motion for Discovery [17] and Motion for Leave to File Short Sur-Reply in Opposition to Plaintiff's Motion for Leave to Amend the Complaint and to Add Parties [35].

motions, in turn.

**Discussion**

## I.    KPI's Motion to Dismiss [15]

As stated above, KPI moves to dismiss AFG's Amended Complaint for failure to state a claim, pursuant to Rule 12(b)(6).  The Court sets out the legal standard governing a Rule 12(b)(6) motion to dismiss before considering KPI's motion on the merits.

### A.    <u>Legal Standard</u>

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).  In order to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 570).  A complaint is plausible on its face

7

when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id.

At the motion to dismiss stage, "all-well pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). However, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Furthermore, the court does not "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

B.    Discussion

In the Amended Complaint, AFG raises the following claims: breach of contract (Count I); defamation (Count II); tortious interference with business relations (Count III); tortious interference with contractual relations (Count IV); fraud (Count V); misappropriation of trade secrets (Count VI); a claim for injunctive relief (Count VII); for violation of the Sherman Antitrust Act and

8

Clayton Act (Count VIII); and for violation of the Georgia law prohibition against contracts in restraint of trade (Count IX).  The Court considers KPI's Motion to Dismiss as to each claim, in turn.

### 1.   Breach of Contract (Count I)

The allegations of AFG's claim for breach of contract are as follows: In 1996, AFG and KPI (or Mr. Oberoi and KPI) entered into an exclusive business agreement whereby the parties agreed to the following:

    (a)    KPI agreed to manufacture all of the products required by AFG for sale in the United States,

    (b)    KPI agreed to sell excusively to AFG and to no other persons or entities in the United States,

    (c)    AFG agreed to sell KPI goods to both end-users and distributors or resellers known to or developed by AFG, and

    (d)    AFG agreed to assist end-users and re-sellers in developing new technologies and specific fiberglass fabric products for exclusive manufacture by KPI under license.

(Am. Compl., Dkt. [1] ¶ 27.)  The parties fully performed this agreement for fifteen years, until KPI's breach on November 18, 2011.  (Id. ¶¶ 28-29.)  On that date, KPI notified AFG of its intention to materially breach the agreement by refusing to sell any products to AFG, including those that had been

developed by AFG and its customers, and by notifying known customers of AFG that KPI would not longer sell to AFG but, rather, would sell to them directly. (Id. ¶ 29.) KPI thus began contacting AFG customers, including, but not limited to, Alpha. (Id. ¶ 30.) KPI informed Alpha that it would no longer sell to AFG but, instead, would sell to Alpha directly. (Id. ¶ 30.) KPI also disclosed to Alpha proprietary pricing information of AFG. (Id. ¶ 31.) KPI falsely represented to Alpha that the reason it would not sell to AFG was that AFG failed to pay its invoices in a timely manner. (Id. ¶¶ 24, 30.) As a result of KPI's breach, AFG has suffered damages, including lost customer goodwill. (Id. ¶ 25, 32.)

KPI moves to dismiss AFG's claim for breach of contract on several grounds, including on grounds that the alleged agreement was of indefinite duration and therefore terminable at will by either party. (KPI's Br. in Supp. of Mot. to Dismiss ("KPI's Br."), Dkt. [15-1] at 13-14.) The Court agrees. Under Article 2 of the Uniform Commercial Code,[5] "Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable

---

[5] The UCC applies to "transactions in goods" and therefore governs the parties' dispute in this case. O.C.G.A. § 11-2-102.

time but unless otherwise agreed may be terminated at any time by either party." O.C.G.A. § 11-2-309(2). This provision is qualified only by the following: "Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party . . . ." O.C.G.A. § 11-2-309(3).

The allegations of the Amended Complaint demonstrate that the alleged "exclusive business agreement" was for an indefinite duration. Accordingly, under the provisions cited above, the agreement was terminable at will by either party, subject only to reasonable notice being given to the other. Because the agreement was terminable at will, KPI's alleged termination of the agreement cannot, by itself, give rise to a claim for breach of contract. At this stage in the litigation, however, the Court cannot determine whether KPI gave AFG "reasonable" notice of its intent to terminate. While AFG alleges that KPI notified it on November 18, 2011 of its intention to terminate the agreement, the Court is unable to determine whether this notice was "reasonable." Accordingly, KPI's Motion to Dismiss is **DENIED** with respect to the breach of contract claim, to the extent the claim is based on this issue of reasonable notice.

AO 72A
(Rev.8/82)

## 2. Defamation (Count II)

AFG's claim for defamation is based on the allegation that KPI falsely represented to customers of AFG that AFG failed to pay its invoices in a timely manner. (Am. Compl., Dkt. [1] ¶ 34.) AFG alleges that this representation was false, as AFG at all times has paid its invoices in a timely fashion. (Id. ¶ 35.) AFG further alleges that KPI made this representation intentionally and maliciously, with the intent of damaging AFG's reputation and customer goodwill, as the representation impugns the trustworthiness of AFG. (Id. ¶ 36.) Finally, AFG alleges that it has suffered damages as a result of KPI's misrepresentations. (Id. ¶ 37.)

KPI moves to dismiss this claim, first on grounds that AFG has failed to plead sufficient facts to make a plausible showing–under Twombly and Iqbal–of defamation. (KPI's Br., Dkt. [15-1] at 18-20.) In this regard, KPI contends that AFG has failed to allege "who at KPI made the statement, to whom the statement was made, when the statement was made, or whether the statement was oral or written." (Id. at 18.) KPI further argues that under Georgia law, a corporation cannot be held liable for defamation perpetrated by an agent unless it is shown that the corporation expressly directed the agent to

speak.  (Id. at 19 (citing cases).)  KPI contends that because AFG has not

alleged that "KPI expressly directed the making of the alleged statement,"

AFG's claim for defamation fails.  (Id.)

Under Georgia law, "[t]o establish a cause of action for defamation, a

plaintiff must submit evidence of (1) a false and defamatory statement about

himself; (2) an unprivileged communication to a third party; (3) fault by the

defendant amounting at least to negligence; and (4) special damages or

defamatory words injurious on their face."  Lewis v. Meredith Corp., 667

S.E.2d 716, 748 (Ga. Ct. App. 2008) (internal quotations and citation omitted).

"To establish a cause of action, the defamatory statement must be published."

Id. (citation omitted).  KPI argues that a corporation cannot be held liable for

defamation under Georgia law absent the added allegation that the corporation

expressly directed the corporate agent to speak the defamatory words.  (KPI's

Br., Dkt. [15-1] at 18-19.)  In support of this argument, KPI cites Word Ins. Co.

v. Peavy, where the Georgia Court of Appeals held as follows:

> A corporation is not liable for damages resulting from the speaking
> of false, malicious, or defamatory words by one of its agents, even
> where, in uttering such words, the speaker was acting for the
> benefit of the corporation, and within the scope of the duties of the
> agency, unless it affirmatively appears that the agent was expressly

directed or authorized by the corporation to speak the words in question. There is authority for the proposition that a corporation may be held liable for the publication of a libel; but it cannot be held responsible for a slander perpetrated by an agent, unless it be affirmatively shown that the corporation, as such, expressly directed the agent to speak the identical words used by him. As the petition did not contain any allegation that the defendant corporation expressly ordered and directed the officer to use the very words which he did use, no cause of action was set forth.

139 S.E.2d 155, 156 (Ga. Ct. App. 1964).

The Court finds that at the motion to dismiss stage of the litigation, AFG has alleged sufficient facts to state a plausible claim for defamation. AFG has alleged a false and defamatory statement, i.e., that AFG failed to pay its invoices in a timely fashion. (Am. Compl., Dkt. [1] ¶ 34.) AFG further has alleged that this statement was made to customers of AFG, including but not limited to Alpha, intentionally and with malice and with the intent to damage AFG's reputation and goodwill. (Id. ¶ 36.) Finally, AFG has alleged that the words were injurious on their face as they "impugn[ed] the trustworthiness of AFG to conduct business and to pay its obligations in a timely manner." (Id. ¶ 36.) Moreover, viewing the allegations in the light most favorable to AFG, and drawing all reasonable inferences therefrom, AFG has alleged that KPI itself, not simply an agent, directed the making of the defamatory statement. (See id.

¶ 34 ("In its communication with the customers of AFG, *KPI* has told the customers that one of the reasons for the purported 'termination' of AFG and of KPI's refusal to sell any more products to AFG was *an allegation by KPI* that AFG failed to pay its invoices to KPI in a timely manner." (emphasis added)).) In sum, at this stage in the litigation, AFG has alleged sufficient facts to make a plausible showing of defamation. KPI's Motion to Dismiss therefore is **DENIED** as to this claim.

> 3. *Tortious Interference with Business Relations (Count III)*
> *and Tortious Interference with Contractual Relations (Count*
> *IV)*

AFG's claims for tortious interference with business and contractual relations are based on the following allegations:

> In its efforts to unlawfully interfere with the long-existing relationships among AFG and its customers, KPI acted improperly without privilege or permission . . . [and] refused to honor its agreement to sell products to AFG, thus preventing AFG from fulfilling the contracts it currently has in place with its customers . . . .

(Am. Compl., Dkt. [1] ¶ 39.)

> KPI intentionally, maliciously, and without privilege or permission took actions by breaching its agreement with AFG so that AFG would not be able to fulfill its obligations to its end users under existing supply contracts.

15

(Id. ¶ 45.)  (See also id. ¶¶ 40, 46 ("The intent of KPI was to remove AFG from the economic equation . . . ."); ¶¶ 41, 47 ("The effort of KPI was specifically intended to induce AFG's customers to cease their existing business relationships with AFG and to instead enter into a business relationship with KPI.").)  KPI moves to dismiss these claims on two grounds: first, on grounds that AFG has failed to identify with which business relations or contracts KPI is alleged to have tortiously interfered and, second, on grounds that AFG has failed to show that KPI acted "without privilege."  (KPI's Br., Dkt. [15-1] at 20-22.)

Under Georgia law, "[t]ortious interference claims, whether asserting interference with contractual relations, business relations, or potential business relations, share certain common essential elements[:]"

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

Fortson v. Brown, 690 S.E.2d 239, 241 (Ga. Ct. App. 2010) (citation omitted).

"The first element's requirement that the tortfeasor acted 'without privilege'

16

requires proof that the defendant was an intermeddler or 'stranger' to the business relationship at issue." ASC Constr. Equip. USA, Inc. v. City Commercial Real Estate, Inc., 693 S.E.2d 559, 564 (Ga. Ct. App. 2010) (citation omitted). "An entity that is a party to an interwoven contractual arrangement is not a stranger to any of the contracts or business relationships that are part of the contractual arrangement and cannot be held liable for tortious interference with any of those contracts or business relationships." Id. (internal quotations and citations omitted). See also Disaster Servs., Inc. v. ERC Partnership, et al., 492 S.E.2d 526, 529 (Ga. Ct. App. 1997) ("Where . . . a defendant had a legitimate interest in either the contract or a party to the contract, the defendant is not a stranger to the contract, although the defendant is a non-signor of a particular contract, it is not a stranger to the contract itself or to the business relationship giving rise thereto and underpinning the contract.").

The Court finds that AFG's claims for tortious interference fail as a matter of law. As KPI correctly argues, it is clear from the allegations of the Amended Complaint that KPI was not a stranger to the contracts between AFG and the latter's customers, with which KPI allegedly interfered. On the

17

contrary, AFG has alleged an "interwoven contractual relationship," according to which (1) AFG agreed to assist its customers in developing technologies and products for exclusive manufacture by KPI; (2) KPI agreed to manufacture those products exclusively for AFG; and (3) AFG agreed to sell those products to its customers. (Am. Compl., Dkt. [1] ¶¶ 16, 27.) The interwovenness of these contractual relationships is further demonstrated by AFG's allegation that KPI's breach of its agreement with AFG "prevent[ed] AFG from fulfilling the contracts it currently has in place with its customers . . . ." (Id. ¶ 39.) Because it appears from the allegations of the Amended Complaint that KPI was not a stranger to AFG's contracts with its customers, AFG's claims for tortious interference fail as a matter of law. KPI's Motion to Dismiss therefore is **GRANTED** as to these claims.

### 4. Fraud (Count V)

In Count V, AFG raises two claims for fraud, the first predicated on the "Harmonized Systems Code" used by the United States Customs Department and KPI's alleged misclassification of goods on commercial invoices, and the second based on KPI's alleged misrepresentation that goods had been or would

AO 72A
(Rev.8/82)

be shipped to AFG.  (See generally Am. Compl., Dkt. [1] ¶¶ 50-64.)  The

allegations of the first fraud claim are as follows:  For more than fifteen years,

KPI represented to AFG that it was experienced in the exporting of fiberglass

fabric.  (Id. ¶ 51.)  KPI further represented that as the manufacturer, it possessed

special knowledge regarding the classification of its fiberglass products

according to the Harmonized Systems Code, used by the United States Customs

Department to insure proper classification and subsequent payment of customs

duties on goods sold to AFG.  (Id. ¶¶ 51, 53.)  AFG relied on KPI to prepare

documentation for and ship the goods to AFG.  (Id. ¶ 54.)

Thus, for more than fifteen years, KPI produced the commercial invoices

for delivery to AFG, which invoices included the Harmonized Code number for

entry of the goods and payment by AFG of duties imposed by the Department

of Customs.  (Id. ¶ 52.)  AFG set its prices, in part, based on the duties owed to

the Department of Customs.  (Id. ¶ 55.)  In 2009, the Department of Customs

conducted an audit of KPI's shipments to AFG and determined that KPI had

misclassified the goods shipped, such that AFG became responsible for

$400,000.00 in additional customs duties and penalties.  (Id. ¶ 56.)

AO 72A
(Rev.8/82)

In support of its second fraud theory, AFG alleges that "in September and October 2011, while planning to tortiously interfere with AFG's business relationships and contracts and to unlawfully terminate the agreement between AFG and KPI, KPI made affirmative statements to AFG that certain materials had been or would be shipped to AFG during the months of November and December." (Id. ¶ 57.) As part of its fraudulent scheme, KPI issued pro forma invoices and advised AFG of purportedly planned shipping details. (Id. ¶ 58.) AFG relied on KPI's representations and therefore did not seek alternative sources of materials needed to fulfill its agreements with its customers. (Id. ¶ 60.) In November 2011, however, AFG learned that KPI, in fact, had not shipped the previously promised goods, "thus deceiving . . . AFG while KPI bypassed AFG and solicited AFG's customers." (Id. ¶ 61.)

Under Georgia law, "[t]he tort of fraud has five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intent to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." Home Depot U.S.A., Inc. v. Wabash Nat. Corp., 724 S.E.2d 53, 60 (Ga. Ct. App. 2012) (internal quotation marks and citation omitted). The Court finds that AFG has failed to state a claim for fraud based on the

20

Harmonized Systems Code but has stated a plausible claim for fraud based on the allegation that KPI failed to ship promised goods.

AFG's claim for fraud based on the Harmonized Systems Code fails because AFG has not alleged two essential elements of the claim—scienter or intent on the part of KPI to induce AFG to act or refrain from acting. In particular, AFG has not alleged that KPI knew the Harmonized Codes were incorrect or that KPI intended to induce AFG to act or refrain from acting based on the Codes it provided. Accordingly, AFG has not alleged the requisite scienter or intent to state a claim for fraud based on the Harmonized Systems Code.

With respect to AFG's second fraud theory, however, AFG has alleged each of the essential elements of a fraud claim. As stated above, AFG alleges that KPI, "while planning to tortiously interfere with AFG's business relationships and contracts and to unlawfully terminate the agreement between AFG and KPI," represented to AFG that certain goods had been or would be shipped, when such goods, in fact, never were shipped. These allegations satisfy the first two elements of AFG's fraud claim—a false representation and scienter, i.e., that KPI knew at the time it made the representation that the

representation was false. AFG also alleges that KPI made the false representation to "deceiv[e] and defraud[ ] AFG while KPI bypassed AFG and solicitied AFG's customers." Relatedly, AFG alleges that it relied on KPI's false representation to its detriment by failing to seek alternative sources of materials necessary to fulfill its contracts with customers. These allegations satisfy the remaining elements of AFG's claim—i.e., that KPI acted with the intent to induce AFG to rely on its false representation, that AFG so relied, and that AFG suffered damages as a result.

In sum, KPI's Motion to Dismiss is due to be **GRANTED** as to AFG's claim for fraud based on the Harmonized Systems Code but **DENIED** as to AFG's claim for fraud based on KPI's alleged failure to ship promised goods.

### 5. *Misappropriation of Trade Secrets (Count VI)*

The allegations of AFG's claim for misappropriation of trade secrets, set out in Count VI, are as follows:

- AFG has developed trade secret technical data, methodologies, product plans, and other trade secret information for the purpose of providing special order fiberglass fabric products to end users.

- For many years, AFG has licensed the use of certain trade secret information to KPI on a limited basis, the understanding of the parties being that (a) the trade secret information is the property of

22

AFG and not KPI and that (b) the products manufactured by KPI utilizing the trade secret information provided by AFG were for the manufacture and sale to no customer other than to AFG for re-sale to its end-users.

- KPI knows that the trade secret information is the property of AFG and not of KPI.

- KPI, through misrepresentation and breach of its duty to maintain the secrecy of the information and in derogation of its limited right to use of that trade secret information, has misappropriated the trade secret information of AFG.

(Am. Compl., Dkt. [1] ¶¶ 66-69.)  AFG further alleges that the

"misappropriation" was willfull and malicious and caused AFG to suffer

damages.  (Id. ¶¶ 70-72.)  KPI moves to dismiss this claim on several grounds,

including on grounds that AFG has failed to allege what trade secrets allegedly

were misappropriated or how they were misappropriated.[6]  (KPI's Br., Dkt. [15-

1] at 27-28.)

Georgia law permits the recovery of injunctive relief and/or damages for

misappropriation of trade secrets.  See O.C.G.A. § 10-1-762 (providing for

injunctive relief); O.C.G.A. § 10-1-763 (providing for damages).  "Trade

---

[6] In addition, KPI argues that this claim must be dismissed because AFG has failed to show that it took reasonable efforts to protect its trade secrets and because AFG "cannot assert any trade secret claim for information learned by KPI during the scope of its engagements."  (KPI's Br., Dkt. [15-1] at 27-29.)

secret" is defined as "information, without regard to form[7] . . . which is not commonly known by or available to the public and which information:"

> (A)  [d]erives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

> (B)  [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10-1-761(4). "Misappropriation" is defined to include the "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of the disclosure or use, knew or had reason to know that knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . ." O.C.G.A. § 10-1-761(2)(B)(ii)(II).

The Court finds that AFG has stated a plausible claim for misappropriation of trade secrets. AFG has alleged that it developed trade secrets in the form of "technical data, methodologies, product plans, and other

---

[7] The statute goes on to enumerate the following forms of information as included under the definition of "trade secret": "technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers[.]"  O.C.G.A. § 10-1-761(4).

trade secret information" related to its "special order fiberglass product." (Am.

Compl., Dkt. [1] ¶ 66.) AFG further has alleged that it licensed its trade secrets

to KPI on a limited basis, the understanding of both parties being that the trade

secrets were the property of AFG and not KPI. (Id. ¶ 67.) Finally, AFG alleges

that KPI misappropriated these trade secrets by failing to protect their secrecy

and by violating KPI's limited right of use. (Id. ¶ 69.) Finally, AFG has

alleged that the misappropriation was willful and malicious. (Id. ¶ 71.)

Contrary to KPI's argument, nothing more is required under Twombly or Iqbal

to state a plausible claim.[8] KPI's Motion to Dimiss therefore is **DENIED** as to

Count VI of the Amended Complaint.

### 6. Injunctive Relief (Count VII)

In Count VII, AFG requests injunctive relief related to its claim for

misappropriation of trade secrets, set out in Count VI, in the form of an order

---

[8] KPI's remaining arguments are premature. As stated in footnote 6, supra, KPI argues that AFG failed to take reasonable efforts to protect its trade secrets, thus forfeiting any claim it may have had to trade secret status. (KPI's Br., Dkt. [15-1] at 27.) At the motion to dismiss stage of the litigation, however, AFG need only allege that it possessed trade secrets, which it has done. Additionally, KPI argues that information learned by KPI during the scope of its engagement is not a trade secret and therefore cannot give rise to a claim for misappropriation. (Id. at 28-29.) Again, however, at this stage in the proceeding, AFG need only allege that it possessed trade secrets, which were misappropriated by KPI, to state a plausible claim.

AO 72A
(Rev.8/82)

preventing KPI from, among other things, contacting customers of AFG in the United States. (Am. Compl., Dkt. [1] ¶ 79.) KPI moves to dismiss this claim, arguing that "AFG's claim for injunctive relief is an attempt to receive a restrictive covenant it never bargained for with KPI." (KPI's Br., Dkt. [15-1] at 30.) In light of the fact that AFG's claim for misappropriation of trade secrets has survived KPI's Motion to Dismiss, see discussion at Part I.B.6, supra, the Court declines to dismiss AFG's claim for injunctive relief at this time. KPI's Motion to Dismiss is **DENIED** as to Count VII.

       7.    *Violation of Sherman Act and Clayton Act (Count VIII)*

In Count VIII, AFG alleges that KPI violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14, "by imposing or attempting to impose a condition of an exclusive dealing arrangement upon former customers of AFG." (Am. Compl., Dkt. [1] ¶ 83.) In particular, AFG alleges as follows:

- AFG has learned that KPI has imposed a condition of exclusive dealing upon [Alpha] (which company has historically purchased millions of dollars of products per year from AFG) to the effect that KPI will only sell some of its proprietary and special order goods (which goods were developed by AFG for Alpha and then manufactured by KPI prior to KPI's breach), including, but not limited to certain

26

PBC coated materials, on the condition that Alpha agrees to purchase all of its materials from KPI and that it purchase nothing from AFG.

- The unlawful tying and exclusive dealing arrangement is intended to and does substantially lessen competition, is inherently anticompetitive, and tends to create a monopoly in favor of KPI.

- Further, the imposition of this unlawful condition has the effect of intentionally creating an impossible barrier to the re-entry of AFG to the market in that AFG cannot immediately produce or source all of the custom fabricated and special order products needed by Alpha in order for the unlawful barrier to be circumvented.

- Upon information and belief, KPI has placed similar conditions on other former customers of AFG.

- As a result of the unlawful actions of KPI, AFG has been damaged and has suffered financial harm in an amount to be determined at trial.

(Id. ¶¶ 84-88.)

Section 1 of the Sherman Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . ." 15 U.S.C. § 1. Similarly, Section 3 of the Clayton Act declares it unlawful:

for any person engaged in commerce, in the course of such commerce, to . . . make a sale or contract for sale of goods . . . for

use, consumption, or resale within the United States . . . on the
condition, agreement, or understanding that the lessee or purchaser
thereof shall not use or deal in the goods . . . of a competitor or
competitors of the . . . seller, where the effect of such lease, sale, or
contract for sale or such condition, agreement, or understanding
may be to substantially lessen competition or tend to create a
monopoly in any line of commerce.

15 U.S.C. § 14.  To state a claim under either provision, a claimant must allege

a relevant geographic market and product market in which harm to competition

is occurring or will occur.  See Jacobs v. Tempur-pedic Int'l, Inc., 626 F.3d

1327, 1336 (11th Cir. 2010) ("Section 1 plaintiffs must define both (1) a

geographic market and (2) a product market."); Tampa Elec. Co. v. Nashville

Coal Co., 365 U.S. 320, 328-29 (1961) (holding that to prevail on Section 3

claim, plaintiff must define a geographic market and "line of commerce, i.e., the

types of goods, wares, or merchandise, etc." (i.e., product market)).

KPI moves to dismiss AFG's Sherman Act and Clayton Act claims,

arguing, among other things, that "AFG has not alleged either a geographic

market or a line of commerce . . . ."  (KPI's Br., Dkt. [15-1] at 33.)  The Court

need not consider whether AFG sufficiently has alleged a relevant product

market, as it agrees with KPI that AFG has failed to allege a relevant

geographic market in which harm to competition is alleged to occur.  This

AO 72A
(Rev.8/82)

failing is fatal to AFG's claims.  KPI's Motion to Dismiss accordingly is **GRANTED** with respect to AFG's federal antitrust claims, set out in Count VIII.

### 7.    *Georgia Law Antitrust Claim (Count IX)*

Based on the same allegations set forth in support of its Sherman Act and Clayton Act claims, AFG also alleges violations of article III, § VI, ¶ 5 of the Georgia constitution and O.C.G.A. § 13-8-2(a)(2), which declare contracts in restraint of trade void as against public policy.  KPI moves to dismiss this claim on two grounds.  First, KPI contends that AFG's state law claim is parallel to its Sherman Act and Clayton Act claims and thus subject to dismissal for the same reasons that the federal law claims are subject to dismissal.  (KPI's Br., Dkt. [15-1] at 35.)  Second, KPI argues that "AFG has no standing to assert a claim for illegal contracts in restraint of trade arising from contracts [between KPI and former customers of AFG] in which it is not a party."  (Id. at 35 (citing Palmer v. Atlantic Ice & Coal Co., 173 S.E.2d 424, 429 (Ga. 1934)).)

The Court finds that KPI has failed to show that AFG's state law antitrust claim is due to be dismissed.  KPI's first argument is unavailing:  KPI has not come forward with any authority for the proposition that the elements of AFG's

state law antitrust claim are parallel to the elements of its federal law claims.

Absent such authority, the Court declines to dismiss AFG's state law claim for

the reasons it has dismissed AFG's federal law claims. KPI's second argument,

though more compelling than the first, is likewise of no avail. As stated above,

KPI contends that unless a claimant is a party to the contract, the claimant lacks

standing to challenge that contract as an illegal restraint on trade. Under certain

circumstances, this appears to be correct. See Palmer v. Atlantic Ice & Coal

Co., 173 S.E. 424, 428-30 (Ga. 1934) (holding plaintiff lacked standing to

challenge contract as one in restraint of trade, where plaintiff was not a party to

the contract and where no facts were alleged to show conspiracy to injure

plaintiff). Under other circumstances, however, the proposition urged by KPI

does not appear to hold true. See Brown v. Jacobs Pharmacy, Co., 41 S.E. 553,

556-57 (Ga. 1902) (holding that plaintiff may challenge contract, to which it is

a stranger, as one in restraint of trade, where it is shown that parties to the

contract conspired to injure plaintiff, such as by destroying plaintiff's business).

While the Court makes no specific finding that AFG has alleged

sufficient facts to bring this case under the authority of Jacobs Pharmacy, the

Court does not accept the general principle argued by KPI—that a third party

may not, under any circumstances, challenge a contract to which it is stranger as an illegal restraint on trade. This being the only remaining ground offered in support of KPI's motion, the Motion to Dismiss is due to be **DENIED** as to Count (IX).

## II. KPI's Motion for Discovery Before Any Hearing on AFG's Motion [for Preliminary Injunction] [17]

In light of the Court's denial of AFG's Motion for Preliminary Injunction [3] (Order, Dkt. [29]), the Court **DENIES as moot** KPI's Motion for Discovery Before Any Hearing on AFG's Motion [for Preliminary Injunction] [17].

## III. AFG's Motion for Leave to File Second Amended Complaint and to Add Parties, S.K. Hwang and Hyo Kyung Cho ("Motion for Leave to Amend and Add Parties") [26]

### A. Preliminary Matters

As a preliminary matter, KPI moves the Court for leave to file a surreply in opposition to AFG's Motion for Leave to Amend and Add Parties. (KPI's Motion for Leave to File Short Sur-Reply in Opposition to Plaintiff's Motion for Leave to Amend the Complaint and to Add Parties ("Motion to File A Surreply"), Dkt. [35].) "Neither the Federal Rules of Civil Procedure nor this Court's Local Rules authorize the filing of surreplies." Fedrick v. Mercedes-

31

Benz USA, LLC, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005) (citing Byrom v. Delta Family Care-Disability & Survivorship Plan, 343 F. Supp. 2d 1163, 1188 (N.D. Ga. 2004)). "To allow such surreplies as a regular practice would put the court in the position of refereeing an endless volley of briefs." Garrison v. N.E. Ga. Med. Ctr., Inc., 66 F. Supp. 2d 1336, 1340 (N.D. Ga. 1999). Rather, surreplies typically will be permitted only in unusual circumstances, such as where a movant raises new arguments or facts in a reply brief, or where a party wishes to inform the Court of a new decision or rule implicating the motion under review. Cf., e.g., Fedrick, 366 F. Supp. 2d at 1197 (stating "valid reason for . . . additional briefing exists . . . where the movant raises new arguments in its reply brief").

In this case, AFG presented new facts and evidence to the Court in its Reply Brief in support of its Motion for Leave to Amend and Add Parties. (See generally Reply to Def.'s Objection to Pl.'s Mot. to Amend and Add Parties ("AFG's Reply"), Dkt. [34] (attaching Affidavit of Madanjit Oberoi, President Atlanta Fiberglass LLC (Dkt. [34-1]) and other evidentiary materials (Dkt. [35-2])).) In light of this presentation of new facts, the Court finds KPI's Motion for Leave to File Surreply [35] due to be **GRANTED**.

AO 72A
(Rev.8/82)

B.    Analysis

AFG seeks leave of Court to file a Second Amended Complaint and to add as Defendants the owners of KPI, Mr. S.K. Hwang and his wife, Ms. Hyo Kyung Cho (hereinafter "Hwang" and "Cho"). (See generally Dkt. [26].) In the proposed Second Amended Complaint, AFG seeks to add a claim for fraudulent transfer under Georgia law against KPI and the two proposed individual Defendants. In support of its proposed claim for fraudulent transfer, AFG alleges as follows:

The original Complaint in this case was filed on December 15, 2011. (AFG's Mot. for Leave to Amend & Add Parties, Dkt. [26] at 1 ¶ 1.) On or about September 10, 2012, while on a business trip in Korea, Mr. Oberoi (the owner and President of AFG) learned that "Defendant [KPI] is aggressively and intentionally transferring its assets to other companies owned either by KPI, or by the owner[s] of KPI, namely, S.K. Hwang and his wife, Hyo Kyung Cho." (Id. at 2 ¶ 3.) The transfers have been made to companies located in Thailand and China and other countries in southeast Asia and have been made for little to no consideration. (Id. at 2 ¶ 3, 3 ¶ 4.) This information was confirmed by a phone call from a customer, who had inquired into purchasing materials from

33

KPI, only to be told that KPI was considering bankruptcy. (Id.) Mr. Oberoi learned through his own investigation that the "express intent of the transfers is to render KPI essentially judgment-proof in the event that AFG prevails in this litigation." (Id.)

AFG further alleges the following: To date, pursuant to KPI's ongoing scheme to cease operations in Korea prior to the end of 2012 and protect its assets from this litigation, KPI has transferred more than $10 million worth of manufacturing equipment to a company located in Thailand, Asia Kangnam, which is 50% owned by KPI, and to a manufacturing facility in China, Kunshan KPI. (Id. at 2 ¶ 4.) This equipment includes, but is not limited to, four fiberglass weaving looms and two coating towers used to coat and finish various fiberglass products. (Id.) "Information provided to Mr. Oberoi indicates that the transfers are being made specifically during the course of the litigation to protect the assets of KPI from any potential judgment against KPI, and for little or no consideration." (Id.)

KPI contends that AFG should not be permitted to add Hwang or Cho as Defendants or to assert a claim for fraudulent transfer against any Defendant. (See generally KPI's Resp. in Opp'n to Pl.'s Mot. for Leave to Amend the

34

Complaint and to Add Parties ("KPI's Opp'n Br."), Dkt. [30].) KPI argues that AFG should not be permitted to add Hwang or Cho as Defendants because the Court lacks personal jurisdiction over them and because adding them would be procedurally superfluous, given that "the corporate entity through whom the alleged wrongdoing occurred, KPI, is already a party to this action." (<u>Id.</u> at 1-3.) In other words, KPI contends that "[t]o the extent a claim for fraudulent transfer exists, KPI is the entity allegedly performing the transfers and it is already a party to this case[.]" (<u>Id.</u> at 3.) KPI also argues that AFG should not be permitted to amend the Amended Complaint to assert a claim for fraudulent transfer because the claim would be futile. (<u>Id.</u> at 15-18.)

The Federal Rules of Civil Procedure provide that leave to amend a pleading should be given "freely" "when justice so requires." Fed. R. Civ. P. 15(a)(2). In deciding whether to give a party leave to amend, the Court should consider factors such as whether there has been "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of the amendment . . . ." <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962). The decision of whether to give

35

leave to amend is within the discretion of the trial court.  Saewitz v. Lexington

Ins. Co., 133 F. App'x 695, 699 (11th Cir. 2005).  Bearing these principles in

mind, the Court considers AFG's request to add as Defendants the owners of

KPI, Hwang and Cho, before turning to its request to raise a new claim for

fraudulent transfer.

1.      *AFG's Motion to Add Parties, S.K. Hwang and Hyo Kyung*
        *Cho*

The Court agrees with KPI that AFG should not be permitted to add as

Defendants the individual owners of KPI, Hwang and Cho.  As KPI correctly

argues, AFG's claim for fraudulent transfer is against KPI, not KPI's owners.

As explained in subsection 2, infra, Georgia's Uniform Fraudulent Transfer Act

gives a creditor a cause of action against a "debtor" who has made a fraudulent

transfer.  O.C.G.A. §§ 18-2-74 to -75.  The alleged "debtor" in this case is KPI.

Because KPI's individual owners are not alleged "debtors" of AFG, or

transferees of the property that allegedly was fraudulently conveyed, there is no

basis on which AFG possibly could assert its claim for fraudulent transfer

against them.  Moreover, as KPI correctly argues, AFG has failed to allege any

facts that would support piercing the corporate veil and holding KPI's owners

36

liable for the alleged acts of KPI.  <u>See, e.g.</u>, <u>EnduraCare Therapy Mgmt., Inc v.</u>

<u>Drake</u>, 681 S.E.2d 168, 171 (Ga. Ct. App. 2009) ("It is well settled that owners .

. . of a corporation are not personally liable for corporate acts until such time as

the corporate veil has been successfully pierced.  Even in a case of alleged

fraud, the corporation's shareholders cannot be held accountable for the

fraudulent acts of the underlying corporation, absent some alleged reason to

disregard the corporate form." (internal quotations and citations omitted)).  In

sum, the Court finds that KPI's owners, Hwang and Cho, are not proper parties

to AFG's proposed claim for fraudulent transfer.  AFG's Motion to Add Parties

therefore is **DENIED**.

> 2. *AFG's Motion For Leave to File Second Amended*
> *Complaint to Add a Claim for Fraudulent Transfer*

Despite the foregoing, the Court finds that AFG should be permitted to

amend the Amended Complaint to assert a claim for fraudulent transfer against

KPI.  Contrary to KPI's argument, the Court at this stage in the litigation cannot

conclude that the proposed amendment would be futile but finds, rather, that

AFG has alleged the essential elements of its claim.  AFG's proposed claim

arises under Georgia's Uniform Fraudulent Transfer Act ("UFTA"), O.C.G.A. §

18-2-70, et seq. (AFG's Reply, Dkt. [34] at 8, 9.) Under O.C.G.A. § 18-2-74(a):

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>>
>> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>
>>> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> (B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Under O.C.G.A. § 18-2-75(a):

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

38

To prevail on a claim under either provision, a plaintiff ultimately must prove: "(1) there was a claim against Defendant by Plaintiff; (2) the Defendant did not receive relatively equivalent value in consideration of the transfer; and (3) Defendant was insolvent or likely to become insolvent." CSX Transp., Inc. v. Leggett, No. 1:07-cv-1152-WSD, 2010 WL 3210841, at *4 (N.D. Ga. Aug. 12, 2010) (citations omitted). A "claim" is defined by the UFTA as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." O.C.G.A. § 18-2-71.

AFG has alleged each of these essential elements, and while KPI argues that AFG cannot prove them, that is not AFG's burden at this stage in the litigation. AFG has alleged that it had a claim against KPI—i.e., those asserted in this litigation—at the time KPI made the challenged transfers, thus satisfying the first element of its claim. The second element of its fraudulent transfer claim is also satisfied, as AFG has alleged that KPI transferred to other entities millions of dollars of manufacturing equipment for little to no consideration. Finally, AFG has satisfied the third element of its claim by alleging that KPI made the transfers while contemplating bankruptcy and with the express intent

39

to render KPI judgment-proof.  Given that AFG plausibly has alleged the essential elements of its claim, and considering the policy of the Federal Rules of Civil Procedure that leave to amend should be granted "freely," the Court **GRANTS** AFG's Motion for Leave to File a Second Amended Complaint to assert a claim for fraudulent transfer against KPI.

### Conclusion

In accordance with the foregoing, KPI's Motion to Dismiss [15] is **GRANTED in part** and **DENIED in part**.  It is **GRANTED** with respect to AFG's claims for tortious interference with business relations (Count III); tortious interference with contractual relations (Count IV); and violation of the Sherman Antitrust Act and Clayton Act (Count VIII).  It is **DENIED** with respect to AFG's claim for breach of contract (Count I), but only as to the theory that KPI failed to give AFG reasonable notice of its intent to terminate the alleged agreement; defamation (Count II); misappropriation of trade secrets (Count VI) and injunctive relief (Count VII); and, finally, for violation of the Georgia law prohibition against contracts in restraint of trade (Count IX). Finally, it is **GRANTED** with respect to AFG's claim for fraud based on the

AO 72A
(Rev.8/82)

Harmonized Systems Code (Count III) but denied with respect to AFG's claim for fraud based on KPI's alleged failure to ship promised goods (Count III).

KPI's Motion for Discovery [17] is **DENIED as moot**. AFG's Motion For Leave to File Second Amended Complaint and to Add Parties, S.K. Hwang and Hyo Kyung Cho [26] is **GRANTED in part** and **DENIED in part**. AFG's Motion for Leave to File a Second Amended Complaint [26] is **GRANTED** as to KPI, but AFG's Motion to Add Parties, S.K. Hwang and Hyo Kyung Cho [26] is **DENIED**. Finally, KPI's Motion For Leave to File Short Surreply in Opposition to Plaintiff's Motion for Leave to Amend the Complaint and to Add Parties [35] is **GRANTED**.

**SO ORDERED**, this __28th__ day of November, 2012.


_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)