IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ATLANTA FIBERGLASS USA, LLC, A Georgia Limited Liability Company, :<br><br>Plaintiff, :<br><br>v. :<br><br>KPI, CO., LTD., A Korean, Company, :<br><br>Defendant. : | CIVIL ACTION NO.<br>1:11-CV-4367-RWS |

## ORDER

This case comes before the Court on Plaintiff Atlanta Fiberglass USA, LLC's ("AFG") Motion to Enforce Settlement Agreement (Doc. 40) and Defendant KPI, Co., LTD's ("KPI") Motion for Leave to File 3 Page Sur-Reply in Opposition to Plaintiff's Motion to Enforce Settlement Agreement (Doc. 52). After a review of the record, the Court enters the following Order.

## BACKGROUND and PROCEDURAL HISTORY

AFG alleges that KPI breached an exclusive business agreement governing the manufacture and sale of fiberglass fabric. The factual background underlying this litigation is set out in a previous Order, (Doc. 36), and need not be revisited

here. To resolve the pending motions, the Court need only consider new facts presented by the parties regarding an alleged oral settlement agreement.

The circumstances surrounding the purported settlement agreement are heavily disputed by the parties. According to the affidavit of Madanjit Oberoi, president of AFG, principals of both AFG and KPI met in Atlanta on January 31, 2013[1], and reached a "verbal agreement on all material terms necessary to settle this litigation and all disputes between the parties." (Doc. 40-1 at ¶ 7). The material terms of the settlement agreement included the following: (1) dismissal of all claims and counterclaims in this litigation upon completion of certain payments between the parties; (2) KPI would pay $20,000 per month to AFG for consulting services for a period of 36 months; (3) AFG would pay the $20,000 received for consulting services back to KPI to satisfy outstanding invoices; (4) S.K Hwang, president of KPI, would invest $4,000,000 in Washington Thermal Fabrics, LLC, ("Washington Thermal"), a company owned by Madanjit Oberoi; (5) the investment could be split among four of S.K. Hwang's family members for purposes of obtaining immigration visas to the United States; and (6) S.K. Hwang would provide collateral for the $4,000,000 investment in the form of security interests in property he owned in South Korea. (*See id.* at ¶ 10). After the parties

---

[1] Madanjit Oberoi and Biren Oberoi attended the meeting on behalf of AFG, and S.K Hwang, Jae Wook Kim, and Junghwan Hwang attended on behalf of KPI. (Doc. 40-1 at ¶¶ 5-6).

agreed to the terms, they went to dinner to celebrate the agreement, and Madanjit Oberoi contacted AFG's counsel by telephone and outlined the terms of the verbal agreement and requested counsel draft both a Settlement Agreement and an Operating Agreement for Washington Thermal. (*Id.* at ¶¶ 8, 9).

Madanjit Oberoi further asserts in his affidavit that the parties reconvened the next day to discuss the new business venture in Washington Thermal. (*Id.* at ¶ 11). At the meeting, AFG disclosed confidential and proprietary business information related to the new business venture, including capitalization, the size of the potential market, expected revenues, and expected return on investment. (*Id.*). The parties also reviewed each paragraph of the Settlement Agreement and Operating Agreement of Washington Thermal, which AFG's counsel had prepared the night before. (Doc. 49-2 at ¶ 4). KPI suggested several changes to the Settlement Agreement, and those changes were made by Biren Oberoi, Vice-President of AFG, who prior to the conclusion of the meeting, printed and delivered to KPI a revised agreement incorporating the changes. (Doc. 40-1 at ¶ 12). After discussing the Settlement Agreement, the parties went to a celebratory lunch where photographs were taken to memorialize the agreement. (*Id* at ¶ 14).

KPI, on the other hand, denies that a settlement was reached. According to the declarations of Jung-Hwan Hwang, Jae Wook Kim, and S.K. Hwang[2], the January 31, 2013 meeting was mostly spent discussing personal matters and the parties' positions in the lawsuit, not a potential settlement. (Doc. 48-1 at ¶ 7; Doc. 48-2 at ¶ 7; Doc. 48-3 at ¶ 7). Madanjit Oberoi and Biren Oberoi did attempt to persuade S.K. Hwang to invest in a company called Washington Thermal, but no details regarding the operation of the company were discussed, and S.K. Hwang indicated that he needed to review in more detail the potential profitability of the investment before making any sort of guarantee. (Doc. 48-3 at ¶ 8). According to S.K. Hwang, at no time during the meeting did he agree to make any payments to AFG, settle the litigation, or invest in Washington Thermal. (Doc. 48-2 at ¶¶ 18-23). The parties did go to dinner that night after the meeting, but the dinner was not a celebration of any sort of settlement agreement. (*Id.* at ¶ 10).

KPI also disputes AFG's account of the February 1, 2013 meeting. S.K. Hwang asserts in his declaration that Madanjit Oberoi started to explain confidential information regarding Washington Thermal's technology in detail at the beginning of the meeting, but Biren Oberoi intervened to stop him from sharing additional information. (Doc. 48-2 at ¶ 11). Even after the interruption, "Madanjit

---

[2] In its Reply Memorandum, AFG contends that the Court should disregard these unsworn declarations because they fail to comply with 28 U.S.C. § 1746. (Doc. 49 at 2-3). The Court will address this argument later in the Order.

said he could share additional information and began to continue speaking," but he revealed only general information about Washington Thermal's technology. (*Id.* at ¶ 11). Mandanjit Oberoi also asked S.K. Hwang at the meeting to invest $4,000,000 in Washington Thermal, but S.K. Hwang declined to make any investment at that time. (*Id.* at ¶ 12). Near the end of the meeting, KPI representatives received the Settlement Agreement and Operating Agreement from Madanjit Oberoi, who asked them to review the documents with KPI's counsel. (*Id.* at ¶ 13). The parties then went to lunch and took some pictures, but the lunch was not an occasion to celebrate a settlement agreement. (*Id.* at ¶ 15).

According to e-mails submitted by the parties, after the meeting on February 1, 2013, Junghwan Hwang e-mailed Biren Oberoi regarding S.K. Hwang's potential $4,000,000 investment in Washington Thermal. (Doc. 40-4). Junghwan Hwang sought to change the Settlement Agreement to reflect S.K. Hwang's desire to personally guarantee the investment without pledging his real estate assets as security. (*Id.* at 2). Jungwhan Hwang instructed Biren Oberoi to "correct the sentence as necessary." (*Id.*).

Jungwhan Hwang, on behalf of S.K. Hwang, also e-mailed Mandanjit Oberoi on February 1, 2013 concerning the capital structure of Washington Thermal. (Doc. 40-5). Junghwan Hwang asked Mandanjit Oberoi how much the total investment of Washington Thermal would be, and suggested that S.K. Hwang

receive 25% of the shares of Washington Thermal if total investment was $8,000,000, and 20% of the shares if total investment was $10,000,000. (*Id.* at 2). Jungwhan Hwang informed Mandanjit Oberoi that S.K. Hwang preferred "the first option but whichever you decide, [he is] fine with it." (*Id.*).

On February 4, 2013, Mandanjit Oberoi e-mailed Jungwhan Hwang to discuss the purpose of S.K. Hwang's $4,000,000 investment. (Doc. 48-1 at 14). He explained that the "settlement of $4,000,000 is to meet part of the losses suffered by AFG, USA ... [but in order to] create conditions to become friends once again ... I said that part of the settlement amount of $4,000,000 I am willing to adjust as shares of the new venture, [Washington Thermal], to Mr. Hwang and to make him a 20% partner." (*Id.* at 15). Biren Oberoi also e-mailed Jungwhan Hwang to explain that the purpose of the settlement offer was "to make this law suit end amiably. The offer of shares in WTF are meant to '...induce' AFG not to continue the law suit in the Federal Court, it is not a business deal where we are seeking investors for the project." (Doc. 48-1 at 18).

The record also contains e-mails sent by the parties' attorneys. In a February 1, 2013 e-mail, AFG's attorney sent both the original and redline copy of the Settlement Agreement to KPI's attorney. (Doc. 48-5 at 1). KPI's attorney responded by saying that "I know the parties have several other issues to address and documents to review and approve before we can finalize ... I have not

reviewed any of the documents but already know of a couple material issues that need to be revised … I look forward to working together on this potential deal and meeting you in person." (*Id.*). Almost a month after the February 1, 2013 e-mail, AFG's attorney e-mailed KPI's attorney and said, "Since it appears that we wasted a couple of weeks on settlement that went nowhere, would you please be kind enough to grant me a brief extension of time to respond to your discovery requests?" (*Id.* at 4).

Discussions of a final settlement continued on March 3, 2013, when AFG's counsel asked KPI's counsel for his "thoughts on the restrictions/protections [he] would envision for the Hwangs as minority shareholders in a potential new investment[.]" (*Id.* at 8). He also asked whether the $4,000,000 investment would be on the table "if the deal is structured properly, with adequate safeguards to your folks and the funds [are] used for WTF (the new company) and not for Obi's personal use …." (*Id.* at 10). KPI's attorney responded the following day stating that KPI might reach a "global resolution" of this matter if issues regarding, among other things, management, ownership, return of capital, and Washington Thermal's business plan were resolved. (*Id.* at 7).

On March 11, 2013, AFG's attorney e-mailed KPI's attorney a copy of a proposed settlement agreement. (*Id.* at 11). The proposed agreement was "substantially in the form as was previously discussed, and as … Mr. Hwang"

contemplated in the previous settlement discussions. (*Id.*). AFG's attorney conveyed to KPI's attorney that "Mr. Oberoi is very serious about this proposal ... [and] [i]f Mr. Hwang says 'OK', this deal is done." (*Id.*). The deal was not approved by KPI. (Doc. 48 at 12).

As a result of the foregoing, AFG filed a Motion to Enforce Settlement Agreement, which motion is currently before the Court. (Doc. 40). In that motion, AFG asserts that the parties verbally agreed to all material terms necessary to settle this litigation on January 31, 2013, and it requests the Court enter an order affirming the oral agreement. (Doc. 40 at 2). KPI filed a response asking the Court to deny AFG's motion because no representative of KPI agreed to settle this litigation and no meeting of the minds occurred on all essential terms. (*See generally* Doc. 48). AFG replied on July 3, 2013. (Doc. 49). A week later, KPI moved for leave to file a surreply, which motion is also before the Court. (Doc. 52).

## DISCUSSION

### I. KPI's Motion for Leave to File Surreply

As a preliminary matter, KPI moves the Court for leave to file a surreply in opposition to AFG's motion to enforce settlement agreement. (Doc. 52). KPI contends that the surreply is necessary to address new facts and evidence presented by AFG in its Reply Memorandum. (*Id.* at 1). AFG did not respond to the motion.

"Neither the Federal Rules of Civil Procedure nor this Court's Local Rules authorize the filing of surreplies." *Fedrick v. Mercedes–Benz USA, LLC*, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005) (citing *Byrom v. Delta Family Care–Disability & Survivorship Plan*, 343 F. Supp. 2d 1163, 1188 (N.D. Ga. 2004)). "To allow such surreplies as a regular practice would put the court in the position of refereeing an endless volley of briefs." *Garrison v. N.E. Ga. Med. Ctr., Inc.*, 66 F. Supp. 2d 1336, 1340 (N.D. Ga. 1999). Rather, surreplies typically will be permitted only in unusual circumstances, such as where a movant raises new arguments or facts in a reply brief, or where a party wishes to inform the Court of a new decision or rule implicating the motion under review. *Cf., e.g., Fedrick*, 366 F. Supp. 2d at 1197 (stating "valid reason for ... additional briefing exists ... where the movant raises new arguments in its reply brief").

In this case, AFG presented new facts and evidence, including a completed settlement agreement and a supplemental affidavit from Madanjit Oberoi, in its Reply Brief in support of its Motion to Enforce Settlement Agreement. (*See* Docs. 49-1, 49-2, 49-3, 49-4). In light of this presentation of new facts and evidence, the Court finds KPI's Motion for Leave to File Sur-Reply (Doc. 52) due to be **GRANTED**.

## II. Verification Pursuant to 28 U.S.C. § 1746

In its Reply Memorandum, AFG argues that the unsworn declarations of Jung-Hwan Hwang, Jae Wook Kim, and S.K. Hwang (Docs. 48-1, 48-2, 48-3) should not be considered by the Court because they fail to comply with 28 U.S.C. § 1746, in that the declarations do not subject the declarants to the penalty of perjury. (Doc. 49 at 2-3). AFG is correct that the declarants in their initial declarations did not state under penalty of perjury that their assertions were true and correct, as required by 28 U.S.C. § 1746. *See Tishcon Corp. v. Soundview Communciations, Inc.*, Civil Action No. 1:04-CV-524-JEC, 2005 WL 6038743, at *3 (N.D. Ga. Feb. 15, 2005) (construing 28 U.S.C. § 1746 as requiring "language in substantially the following form, 'I declare (or certify, verify, or state) under penalty of perjury ... that the foregoing is true and correct ....' ") (quoting 28 U.S.C. § 1746). However, the defects in the initial declarations were cured by KPI's submission of supplemental declarations, in which the declarants incorporated by reference, and declared under penalty of perjury to the truth of, all of the assertions in the initial declarations. (*See generally* Docs. 52-1, 52-2, 52-3). The Court will therefore consider the declarants' initial declarations when ruling on the motion to enforce settlement agreement. *See Voter Verified, Inc. v. Election Systems & Software Inc.*, No. 6:09–cv–1969–Orl–19KRS, 2011 WL 149275, at *2 (M.D. Fla. Jan. 11, 2011) (refusing to strike declaration on grounds that it did not

comply with 28 U.S.C. § 1746 because the defendant filed a supplemental declaration that complied with the statute and incorporated by reference the assertions in the original declaration); *see also Perches v. Elcom, Inc.*, 500 F. Supp. 2d 684, 689 (W.D. Tex. 2007) (same).

## III. Motion to Enforce Settlement Agreement

### A. Standard of Review

When construing and enforcing settlement agreements, the Court applies state contract law. *Cohen v. DeKalb County School Dist.*, No. 1:09–cv–1153–WSD., 2009 WL 4261161, at *4 (N.D. Ga. Nov. 25, 2009) (citing *Vinnett v. Gen. Elec. Co.*, 271 Fed. Appx. 908, 912 (11th Cir. 2008). Because the Court sits in diversity, Georgia law controls this case. Under Georgia law, courts evaluate a motion to enforce a settlement agreement under "standards similar to a motion for summary judgment." *Id.* (citing *Ballard v. Williams*, 223 Ga. App. 1, 476 S.E.2d 783, 784 (Ga. Ct. App. 1996). "To prevail, a party must show the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of the [plaintiff's] case." *Walls v. Walls*, 260 Ga. App. 673, 675, 580 S.E.2d 564 (Ga. Ct. App. 2003). The moving party bears the burden of showing the absence of a genuine issue of material fact, and "[t]he Court must draw all disputed factual inferences in the light most favorable to the non-moving party."

*Cohen*, 2009 WL 4261161, at *4 (citing *Vinnett*, 271 Fed. Appx. at 912). "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999).

## B. Applicable Law

Under Georgia law, "an agreement for settlement and compromise of a pending lawsuit must meet the same formation and enforceability requirements as any other contract." *Cohen*, 2009 WL 4261161, at *4 (citing *Blum v. Morgan Guar. Trust Co. of New York*, 709 F.2d 1463, 1467 (11th Cir. 1983). The necessary elements of a contract include "(1) parties that are able to contract; (2) consideration; (3) mutual assent of terms; and (4) subject matter of the contract." *Id.* (citing O.C.G.A. § 13-3-1).

"[I]t is well settled that an agreement between two parties will occur only when the minds of the parties meet at the same time, upon the same subject matter, and in the same sense." *Southern Medical Corp. v. Liberty Mut. Ins. Co.*, 216 Ga. App. 289, 291, 454 S.E.2d 180 (Ga. Ct. App. 1995). To constitute a valid contract, there must be a meeting of the minds on all essential terms. *Cohen*, 2009 WL 4261161, at *5. "[I]f there was in fact any essential part of the contract upon which the minds of the parties had not met, or upon which there was not an agreement ... it must follow that a valid and binding contract was not made."

*BellSouth Advertising, etc., Corp. v. McCollum*, 209 Ga. App. 441, 445, 433 S.E.2d 437 (1993).

"An oral settlement agreement must be definite, certain and unambiguous. For such an agreement to be binding on the parties it should be clear that it is full and complete, covers all issues, and is understood by all litigants concerned." *Tekin v. Whiddon*, 233 Ga. App. 645, 648, 504 S.E.2d 722 (Ga. Ct. App. 1998) (quoting *Grossman v. Smith, Barney, etc.*, 211 Ga. App. 243, 247, 438 S.E.2d 700 (Ga. Ct. App. 1993).

### C. Analysis

AFG contends that the parties entered into a binding settlement agreement on all material terms on January 31, 2013, and that the parties evidenced their assent to the agreement through their subsequent actions and words. (*See generally* Doc. 40). More specifically, AFG asserts that a settlement agreement can be inferred from its decision to disclose confidential information to KPI about Washington Thermal, S.K. Hwang's announcement of a settlement agreement, and the parties' celebratory dinners and photographs. (*Id.* at 9-13). KPI argues that the motion to enforce settlement should fail because genuine issues of fact exist regarding whether KPI agreed to settle the agreement orally or in writing and whether the parties had a meeting of the minds on all essential terms. (Doc. 48 at 15-23).

The Court agrees with KPI and finds that genuine issues of fact preclude enforcement of the alleged settlement agreement. "An oral compromise, where denied by one of the parties, creates an issue of fact, and it will not be adopted by the court unless it appears that the terms were understood and agreed to by those concerned" *Cross v. Cook*, 147 Ga. App. 695, 250 S.E.2d 28 (Ga. Ct. App. 1978). In this case, issues of fact are presented because KPI disputes not only the terms of the alleged January 31, 2013 oral agreement, but the very existence of the agreement itself. While the proposed Settlement Agreement drafted by counsel for AFG provides some evidence of an agreement between the parties, it is not sufficient in itself to require entry of judgment in AFG's favor. *See City of Albany v. Freeney*, 313 Ga. App. 24, 28, 720 S.E.2d 349 (Ga. Ct. App. 2011) ("While letters or documents from one party's attorney 'will suffice' to establish written evidence of a settlement, such letters do not *require* entry of summary judgment in that party's favor in every case.") (emphasis in original). Indeed, Georgia courts have found issues of fact in cases with far stronger evidence of agreement than the unsigned and disputed Settlement Agreement submitted by AFG. *See id.* (reversing trial court's enforcement of a settlement agreement and finding issues of fact where the plaintiff's attorney, after a settlement conference, accepted in writing the defendant's offer of settlement to which the defendant did not respond); *Moreno v. Strickland*, 255 Ga. App. 850, 853, 567 S.E.2d 90 (Ga. Ct. App. 2002)

(finding that a "letter from [the plaintiff's] attorney accepting the offer" provided evidence "sufficient to create a question of fact regarding whether the parties settled this claim").

AFG argues that mutual assent to the agreement should be inferred from the conduct of the parties, particularly AFG's decision to disclose confidential information to KPI about Washington Thermal, and the parties' celebratory dinners and photographs. (Doc. 40 at 9-13). It is true that the "circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement." *McKenna v. Capital Resource Partners, IV, L.P.*, 286 Ga. App. 828, 832, 650 S.E.2d 580 (Ga. Ct. App. 2007) (quoting *Terry Hunt Constr. v. AON Risk Svcs. etc.*, 272 Ga. App. 547, 552(2), 613 S.E.2d 165 (2005)). But where such "extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury." *Id.* (quoting *Terry*, 272 Ga. App. at 552(2)). Here, KPI disputes all of AFG's evidence of mutual assent. With respect to the alleged disclosure of confidential information, according to the declarations submitted by KPI, Mandanjit Oberoi initially began discussing Washington Thermal's technology in some detail, but revealed only general information about the company after Biren Oberoi intervened and warned Mandanjit Oberoi about sharing additional information. (*See* Doc. 48-2 at ¶ 11). As for the celebratory

meals and photographs, although representatives of KPI do not dispute eating meals and taking photographs with AFG representatives, they disagree that these actions were undertaken to celebrate a settlement agreement. (*See id.* at ¶¶ 10-15). Because the circumstances surrounding the making of the contract are disputed, issues of fact remain.

Whether an oral agreement was reached on January 31, 2013 is further called into question by the communications between opposing counsel. On February 28, 2013, nearly a month after the parties allegedly agreed to a settlement, AFG's attorney e-mailed KPI's attorney and said that "it appears we wasted a couple of weeks on settlement that went nowhere ...." (Doc. 48-5 at 4). In a March 11, 2013 e-mail, AFG's counsel provided KPI's attorney with a proposed settlement agreement, "substantially in the form" as the previous agreement, and conveyed to him that a deal would be finalized if S.K. Hwang gave his "ok" to the proposed agreement. (*Id.* at 11). AFG's decision to offer and seek acceptance of a settlement agreement from KPI, nearly a month and a half after apparently reaching a binding agreement on substantially similar terms, is inconsistent with a finding of a prior oral agreement.

Even if the Court assumes that the parties orally agreed to settle this litigation on January 31, 2013, it is not clear that the parties agreed to a definite oral agreement or that a meeting of the minds occurred on all essential terms. To

be binding on all the parties, an oral agreement must be definite, certain, and unambiguous. *See Tekin*, 233 Ga. App. at 648. Here, the oral agreement is indefinite because, although it appears from Mandanjit Oberoi's affidavit that S.K. Hwang agreed on January 31, 2013 to invest $4,000,000 in Washington Thermal in return for an ownership interest in the company, there is no evidence to suggest that the parties discussed when S.K. Hwang would receive his ownership interest or how Washington Thermal would be structured. *See Massih v. Mulling*, 271 Ga. App. 685, 687, 610 S.E.2d 657 (Ga. Ct. App. 2005) (concluding that an oral agreement for 20 percent ownership in a company was too indefinite where several details about the ownership were never resolved, including how the plaintiff would receive her ownership or how the company would be structured).[3]

Furthermore, there does not appear to have been a meeting of the minds on January 31, 2013, or at any time thereafter, as to the purpose of S.K. Hwang's

---

[3] In its Reply Memorandum, AFG disputes KPI's contention that the oral agreement was indefinite by pointing out that KPI agreed on February 1, 2013, to language in the Settlement Agreement concerning the ownership and structure of Washington Thermal. (Doc. 49 at 4-6). Regardless of whether this is true, in its initial motion to enforce settlement, AFG moved the Court to enforce an oral settlement agreement that occurred on January 31, 2013, not February 1, 2013. (*See generally* Doc. 40). The Court refuses to address AFG's contention, raised for the first time in its Reply Memorandum, that KPI agreed to a definite oral agreement by approving language in the Settlement Agreement on February 1, 2013. *See, e.g, Wetherbee v. S. Co.*, 423 Fed. Appx. 933, 934 (11th Cir. 2011) ("[A]lthough Wetherbee briefed these issues in detail in his reply brief, we do not consider arguments raised for the first time in a reply brief.").

$4,000,000 investment.[4] According to Mandanjit Oberoi's affidavit and the proposed Settlement Agreement, S.K. Hwang agreed to invest $4,000,000 in Washington Thermal in return for an ownership interest in the new company. (*See* Doc. 49-1 at 2 ("S.K. Hwang agrees personally to pay the sum of [$4,000,000] ... for [shares in Washington Thermal].")). Yet in a February 4, 2013 e-mail, Mandanjit Oberoi explained that the "settlement of $4,000,000 [was] to meet part of the losses suffered by AFG, USA" and that only "part of the settlement amount of $4,000,000" would go toward making S.K. Hwang a 20% partner in Washington Thermal. (Doc. 48-1 at 15). There is no evidence in the record to suggest that Mandanjit Oberoi conveyed to any representative of KPI his intent to use part of the $4,000,000 investment to pay down losses suffered by AFG. In light of the foregoing, the Court finds that there was no meeting of the minds on an essential term and, therefore, no valid and enforceable verbal agreement. AFG's Motion to Enforce Settlement Agreement therefore is **DENIED**.

---

[4] In its Response Memorandum, KPI argues that the $4,000,000 investment was an essential term of the oral settlement agreement. (*See* Doc. 48 at 17-19). In reply, AFG does not dispute that assertion. (*See generally* Doc. 49). Therefore, KPI's contention that the $4,000,000 investment was an essential term of the oral settlement agreement will be treated as unopposed. *See Welch v. Delta Airlines, Inc.*, 978 F.Supp. 1133, 1148 (N.D. Ga. 1997) ("Under Local Court Rule 7.1 of the United States District Court for the Northern District of Georgia, factual and legal claims to which there is no response should be treated as unopposed.").

## **CONCLUSION**

In accordance with the foregoing, KPI's Motion for Leave to File Sur-Reply (Doc. 52) is **GRANTED**. AFG's Motion to Enforce Settlement Agreement (Doc. 40) is **DENIED**.

**SO ORDERED**, this _6th_ day of September, 2013.

_____
RICHARD W. STORY
United States District Court